UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | **CRIMINAL NO.** |
| | : | |
| | : | **VIOLATIONS:  18 U.S.C. §§ 371, 1341, 2,** |
| | : | **981, 28 U.S.C. § 2461** |
| **v.** | : | **(Conspiracy to Defraud the United States,** |
| | : | **Mail Fraud, Causing an Act to Be Done,** |
| | : | **Forfeiture)** |
| **CHRISTINA SONG,** | : | |
| a/k/a **CHRISTY SONG,** | : | |
| | : | |
| **Defendant.** | : | |

## INFORMATION

The United States Attorney and the United States Department of Justice, Criminal Division, Fraud Section, charge that at all times material to this Information:

## INTRODUCTION

1.  CHRISTINA SONG, a/k/a CHRISTY SONG ("SONG") was an owner and employee of V&C Trading/Song Company ("V&C Trading"), an exporting company that was in the business of purchasing United States goods on behalf of clients in the Philippines and shipping those goods overseas.  From in or about December 2001 through October 2004, SONG acted as a purported "exporter" in approximately $17 million worth of fraudulent loan transactions, falsified documents sent to United States banks and to the Export-Import Bank of the United States (the "Ex-Im Bank"), and misappropriated approximately $15 million in loan proceeds that were guaranteed or insured by the Ex-Im Bank.

2.  Co-Conspirator 1 ("CC-1") was a loan broker living in Manila, Philippines.  From in or about December 2001 through October 2004, CC-1 brokered approximately $17 million in fraudulent loan transactions in which SONG acted as an exporter.  As a loan broker, CC-1 would

identify purported borrowers in the Philippines and lending banks in the United States and then assist borrowers in executing loan agreements with the banks and the Ex-Im Bank. Once the loans were finalized, CC-1 instructed SONG to prepare false loan documents, submit the false loan documents to the lending banks and to the Ex-Im Bank, and then misappropriate the loan proceeds.

3. The Ex-Im Bank was an independent agency of the executive branch of the United States and located in Washington, D.C. It was also the official export credit agency of the United States. The mission of Ex-Im Bank was to assist in the export of United States goods and services to companies overseas. One of the ways Ex-Im Bank fulfilled this mission was by issuing loan guarantees to United States lending banks on behalf of creditworthy foreign companies for the purpose of purchasing United States goods. Once Ex-Im Bank issued a loan guarantee, if the foreign borrower defaulted on its loan repayments to a United States bank, the Ex-Im Bank paid the amount of the outstanding loan to the United States bank. Before issuing a loan guarantee, Ex-Im Bank required that a United States exporter - the person or entity shipping the United States goods on behalf of the foreign borrower - certify to Ex-Im Bank the type, amount, and value of the United States goods that it would be shipping and that the goods shipped were made in the United States.

4. Relying on information provided by SONG and others, the Ex-Im Bank provided lending banks with approximately $15 million in loan guarantees, promising that the Ex-Im Bank would reimburse the banks for any losses incurred in the loan transactions. As a result of defaults affiliated with the fraudulent SONG loan transactions, the Ex-Im Bank has paid approximately $9.5 million in claims to the lending banks.

## COUNT ONE
### (CONSPIRACY TO DEFRAUD THE UNITED STATES)

### THE CONSPIRACY

5. Paragraphs 1 through 4 of this Information are realleged and incorporated by reference as if set out in full.

6. From in or about December 2001 through October 2004, in the District of Columbia and elsewhere, SONG, CC-1, and others known and unknown did unlawfully and knowingly agree, combine and conspire together and with each other and others to defraud the United States and agencies thereof and to commit offenses against them, to wit:

   A. to defraud the United States of and concerning its governmental functions and rights, including its right to have the business of the Ex-Im Bank conducted honestly and impartially, free from corruption, fraud, improper and undue influence, dishonesty, unlawful impairment and obstruction, in violation of Title 18, United States Code, Section 371;

   B. to defraud the United States of and concerning its right to have its officers and employees, and particularly the personnel of the Ex-Im Bank, free to transact the official business of the United States unhindered, unhampered, unobstructed and unimpared by the exertion upon them of dishonest, corrupt, unlawful, improper and undue pressure and influence, in violation of Title 18, United States Code, Section 371;

   C. to defraud the Ex-Im Bank, an agency of the United States, to obtain money and property by means of false and fraudulent pretenses, representations, and promises, in violation of Title 18, United States Code, Section 371; and

   D. to knowingly devise, and intend to devise, through the use of the mail, a scheme and artifice to defraud the United States and the Ex-Im Bank, and to obtain money and property by means of materially false and fraudulent pretenses, representations and promises, in violation of Title 18, United States Code, Section 1341.

### A GOAL OF THE CONSPIRACY

7. A goal of the conspiracy was for the co-conspirators, including SONG, to

unlawfully enrich themselves by submitting false and fraudulent information to the Ex-Im Bank, through the lending banks, to obtain and misappropriate the loan proceeds.

## THE MANNER AND MEANS OF THE CONSPIRACY

8. To achieve the goal of the conspiracy, SONG, CC-1, and others used the following manners and means, among others:

    A. CC-1 identified purported borrowers in the Philippines and lending banks in the United States and assisted Philippine borrowers in executing loan agreements with the lending banks and the Ex-Im Bank;

    B. CC-1 instructed SONG to prepare false documents that would be submitted to the lending banks and the Ex-Im Bank to facilitate the fraudulent loan transactions;

    C. SONG prepared false documents stating that United States goods had been purchased and shipped to the Philippine companies and then submitted those documents to the Ex-Im Bank, through the lending banks; and

    D. SONG received the proceeds of the bank loans, retained a portion of that money for her own personal benefit and use, and then transferred millions of dollars of proceeds to foreign bank accounts, including accounts owned and controlled by CC-1.

## OVERT ACTS IN FURTHERANCE OF THE CONSPIRACY

9. Within the District of Columbia and elsewhere, in furtherance of the above-described conspiracy, and in order to carry out the goal thereof, SONG, CC-1, and others known and unknown, committed the following overt acts, among others:

    A. In or about December 2001, SONG met with CC-1 and agreed that SONG, through V&C Trading, would act as "exporter" in loan transactions brokered by CC-1 between Philippine

borrowers and United States lending banks, in which the Ex-Im Bank was guaranteeing or insuring the loans. CC-1 agreed to pay SONG a fee of between 1.5-2.5% of the value of the purported goods to be shipped.

  B. In or about December 2001, CC-1 instructed SONG that lending banks would not pay loan proceeds to V&C Trading until the banks and the Ex-Im Bank received a Commercial Invoice, Packing List, and Ex-Im Bank Supplier's Certificate documenting the amount, value, and origin of United States goods shipped to the Philippines.

  C. From in or about December 2001 through October 2004, SONG prepared and caused the preparation of false Commercial Invoices, Packing Lists, Ex-Im Bank Supplier's Certificates, documenting approximately $17 million worth of United States goods that she had purportedly purchased and shipped to the Philippine borrowers.

  D. From in or about December 2001 through October 2004, SONG sent to Ex-Im Bank, through the lending banks, the Commercial Invoices, Packing Lists, and Ex-Im Bank Supplier's Certificates that she prepared and caused the preparation of, as proof that she had purchased and shipped approximately $17 million worth of United States goods to the Philippine borrowers.

  E. From in or about December 2001 through October 2004, V&C Trading received approximately $15 million in loan proceeds from the lending banks based on SONG's false representations to the lending banks and the Ex-Im Bank that V&C Trading had spent approximately $17 million to purchase United States goods and had shipped those goods to the Philippines. SONG knew at the time that SONG and V&C Trading had actually spent an amount materially and substantially less than $17 million on the United States goods purchased and

shipped to the Philippines. After receiving the approximately $15 million in fraudulent loan proceeds, SONG kept approximately $300,000 of the loan proceeds and transferred approximately $12 million of the loan proceeds to bank accounts owned or controlled by CC-1 and others.

F.   On or about September 25, 2002, SONG caused First International Bank to issue a wire transfer in the amount of $354,748 to SONG's V&C Trading bank account at California Federal Bank, now known as Citibank, after SONG submitted a false Commercial Invoice, Packing List, and Ex-Im Bank Supplier's Certificate related to the Jetri Manufacturing Corporation loan transaction.

G.   On or about October 11, 2002, SONG caused First International Bank to issue a wire transfer in the amount of $826,324.27 to SONG's V&C Trading bank account at California Federal Bank, now known as Citibank, after SONG submitted a false Commercial Invoice, Packing List, and Ex-Im Bank Supplier's Certificate related to the Akaysa Mindanao Inc. loan transaction.

**(Conspiracy to Defraud the United States, in violation of Title 18, United States Code, Section 371)**

## COUNT TWO
## (MAIL FRAUD)

10.     Paragraphs 1 through 4, 8, and 9 of this Information are realleged and incorporated by reference as if set out in full.

11.     From in or about December 2001 through October 2004, in the District of Columbia, and elsewhere, SONG, along with others known and unknown, did knowingly devise and intend to devise a scheme and artifice to defraud the Ex-Im Bank, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and for the purpose of executing such scheme used Federal Express, a commercial interstate carrier.

12.     On or about January 1, 2003, SONG, for the purpose of executing the scheme and artifice to defraud, did knowingly cause to be delivered through Federal Express, a commercial interstate carrier, an Ex-Im Bank Supplier's Certificate to First International Bank, knowing at the time that it would be forwarded to the Ex-Im Bank and that the pretenses, representations, and promises contained in the Ex-Im Bank Supplier's Certificate were false when made.

**(Mail Fraud, Causing an Act to be Done, in violation of Title 18, United States Code, Sections 1341 and 2)**

## **FORFEITURE**

13      As a result of the mail fraud offense alleged in Count Two of the Information, which is realleged and incorporated by reference for the purpose of alleging forfeitures to the United States of America pursuant to Title 18, United States Code, Section 981, and Title 28, United States Code, Section 2461(c), defendant SONG shall, upon conviction of such offense alleged in the Information, forfeit to the United States all property, real and personal, which constitutes or is derived from proceeds traceable to the mail fraud offense, wherever located, and in whatever name held, including, but not limited to a sum of money equal to the amount of proceeds obtained as a result of the mail fraud in violation of Title 18, United States Code, Section 1341.  By virtue of the offense charged in Count Two of the Information, any and all interest that the defendant has in the property constituting, or derived from, proceeds obtained directly or indirectly, as a result of such offenses is vested in the United States and hereby forfeited to the United States pursuant to Title 18, United States Code, Section 981, in conjunction with Title 28, United States Code, Section 2461(c).

14.     In the event that any property described above as being subject to forfeiture, as a result of any act or omission by the defendant:

   (a) cannot be located upon the exercise of due diligence;

   (b) has been transferred or sold to or deposited with a third person;

   (c) has been placed beyond the jurisdiction of the Court;

   (d) has been substantially diminished in value; or

   (e) has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 18, United States Code, Section 981, and Title

28, United States Code, Section 2461, to seek forfeiture of any other property of SONG up to the value of the above described property in paragraph 9(A)-(E).

**(Forfeiture, Title 18, United States Code, Section 981; Title 28, United States Code, Section 2461)**

        JEFFREY A. TAYLOR
        United States Attorney
        In and For the District of Columbia

By: _____/s/_____
   MICHAEL K. ATKINSON
   D.C. Bar # 430517
   Assistant United States Attorney
   Fraud and Public Corruption Section
   555 4th Street, N.W.
   Washington, D.C. 20530
   (202) 616-3702

   STEVEN A. TYRRELL
   Chief, Fraud Section
   Criminal Division
   United States Department of Justice

By: _____/s/_____
   HANK BOND WALTHER
   D.C. Bar # 477218
   Trial Attorney
   Fraud Section, Criminal Division
   United States Department of Justice
   1400 New York Avenue, NW
   Washington, D.C. 20005
   (202) 257-6176

Date:   October 4, 2007